and Mr. Sarmanski. Sarmanski, Your Honor. Sarmanski, I'm sorry. Excuse me, please. I was going to introduce myself because people have trouble with my name, but it is Dan Sarmanski, along with Denise Banks, and I represent the appellant in this case. May I proceed, Your Honor? May indeed. Thank you. I'm going to go directly to the incident report from the Sheriff's Office, from the jail, about this incident. Angela Anderson, the mother of Princess Anderson, and Cynthia, which was her aunt, entered, I'm quoting here, entered the cell area of Princess Anderson. They found her face down, naked, unconscious, viewed multiple bruises on her limbs, both front and back, of Princess's body. They rolled her over and noticed additional bruises to the front side. Moore, which is the aunt, also viewed Princess Anderson in feces and urine that was on the floor and the body of Princess Anderson. They asked the jailer to call 911. Obviously, no parents would want to find their child in state custody in such a condition. When we did this case, I don't do a lot of 1983 cases, one of the unusual things about this case was I do a lot of civil personal injury cases and I depose a lot of doctors. We depose a Dr. Mangel in this case. He's an internal medicine doctor with Baptist Memorial Hospital. And in deposing these physicians, they usually refer to their chart because they like to be detailed because they see a lot of patients and, you know, they have to refer to the chart. But in this case, when I'm sitting across from the physician, just like I'm standing across from you all and I'm looking at him, he starts telling me about his physical examination without looking at anything at all. And I was a little surprised because his physical examination of this person, Princess Anderson, had been over two years earlier. And when I asked him, I said, well, Dr., how is it? We can agree, I mean, that what happened was a real tragedy. And we can even, for the purposes of argument, I mean, assume gross negligence on the part of the individuals that were charged with maintaining the health and safety of the inmates at the prison. But what we're primarily here to do and the primary issue, at least this is speaking from one judge, is Monell liability and how do you establish all of the bad that happened? We concede all of that. How do you establish that the county is liable for the gross negligence of the jailers? Now, you tell us that. All right. And the reason is based on the facts of this case. That physician who testified without looking at anything said this is. You can't get there. There, it seems to me, the facts of this case. We are conceding the facts of this case, aren't we? Well, I'm talking about let me be more specific. I was I should have been more specific. The nature of the injuries. These are injuries. All right. The dehydration, the malnourishment, the rhabdomyolysis, which is a breakdown of muscle tissue. These are injuries that take time to occur. I mean, what I'm driving at and I apologize for interrupting you, but what I'm driving at is that you have got to show that this resulted from a policy of the county. Yes. And you've got to show in generally you've got to show more than a single incident. So you've either got to rely upon other instances that is a pattern of similar misconduct or a specific policy that is the driving and moving force of the injury you complain of. And if we can narrow it to that, your time, I think, would be well spent. I will judge. And I actually was headed that way because let me just say this. The nature of the injuries are such that they didn't they took time to occur. It took shifts to occur. When you look at the testimony and you have to look at in the light most favorable to the plaintiff, to the appellant, there is testimony that nobody checked on this inmate from Wednesday night until Friday when she was taken away. That means that it wasn't just one guard that made a mistake. It wasn't just one jailer that made a mistake. It happened shift after shift, jailer after jailer. This is a fundamental problem. It wasn't a problem that one jailer had a bad day. This is a systematic problem with the jail. And the systematic problem is they did not train their staff, their jailers who are in charge of the prisoners, they did not train them on what to look out for, especially as it pertains to mental patients. This person, Princess Anderson, as you probably know, she was not a prisoner, had not been arrested. She was involuntarily committed because she couldn't take care of herself. That's what an involuntary commitment is. They are not capable of taking care of themselves. The jailer has to take care of it, jailer after jailer, shift after shift. It didn't happen. You need, as Judge Jolly said, you need a policy that you can attribute to the county, but you also need, on the underlying constitutional violation, someone who was deliberately indifferent. And as I read your brief and as you're saying now, it's just sort of, well, all the jailers, if you look at it, weren't doing a good job. But it was largely different people on different shifts. So who committed the underlying constitutional violation? I believe the county did, and this is why. Valley versus City of Houston. On a failure to train, I think there has to be an individual who committed a constitutional violation that then you attribute to the county because they failed to train that individual. Let me just quote what the case here says on the Valley case. It says, quote, The failure to provide proper training may fairly be said to represent a policy for which the city is responsible and for which the city may be held liable if it actually causes the injury. And that's our position, just like in Valley. If there's an underlying constitutional violation? Yes. Committed by whom? Well, it's going to be committed by all the guards. That's the trouble when it's a systemic failure with the institution, is that when you haven't trained the guards, none of them know what to do. So it's not just one guard. It's all the guards that ever watched her. Do you have any cases saying you can collectively find a constitutional violation? I mean, if you'd sued them all individually, you would have sued every jailer and tried to get a verdict on each jailer being deliberately indifferent? We I mean, we thought about that. If you sued every jailer, one jailer is going to say, well, yeah, I looked at her for eight hours, but you know what? Somebody else looked after after me. Somebody else looked at her before me. And it's therefore there's no causation for me because somebody else saw her after me. Everybody can say that you that's that's why when that's why the failure to train is the same as a. It's the same as putting forth a policy. You, the city, you, the county, you are. You've got to train a classic case for these situations. It's a police officer beating someone up excessive force. And my understanding is you have to show the police officer used excessive force constitutional violation. And then you have to show. And that's attributable to this policy. They should have. They've been doing this for years. There's been all these police beatings or a failure to train. But my understanding is you need that underlying violation committed by someone. Well, I guess my response would be the I cannot point to you, judge, and say, look, this particular jailer on this particular shift is the one that dropped the ball because they all dropped the ball. And so if that's it, it's my understanding that you can have a constitutional violation without having just one person violating that person's rights. Section 1983 focuses on the rights of the individual that she's deprived of her right to medical care. That's a deprivation of her rights. By whom? That's the whole. By the county. By the county. When it failed. The county is not liable for the gross negligence of its agents unless it's pursuant to a policy that is adopted by the county. Yes. Now, you say that the policy adopted by the county was that they had a policy of not training their officers. Now, what specific training are you complaining that they did not receive that would have addressed this particular injury? They were not they were not trained to recognize injuries that were not. Wait a minute. Here's a woman lying on the floor. In her feces and vomit. She is comatose half the time she does. Anybody can look at that. You don't need training to know that woman is in distress. Now, what training did they not get that if they had gotten this would have been prevented or ameliorated? Training with regard to the importance of a prisoner eating, drinking, and it's not just. I mean, that's not training. Well, Your Honor, they did. Here's why I say that. When Ardella Anderson testified, who was one of the jailers, one of them, OK, and I said I asked her this question and it's in our brief. I said, if it's not a visible injury and, you know, what do you do if you can see it? OK, we all understand. If you can see it, you call the ambulance. But what if it's not visible? Here's what she answered. There's nothing I can do about that. If it's just I'm going to check and see what kind of signs they've got, that's as far as I can go. I'm not medical personnel. All she's doing is looking for visible injuries. If somebody's just laying there and unconscious and passed out, she doesn't see that as an injury. No training. In other words, you're saying that these people were so inured to and so callous, I should say, that they see somebody lying like that and there's some training that they need to recognize that that person is in dire need of some help? I think there is some training. I mean, the argument is the cases say if it's the injury, is it closely related to what the training would have been? The training is that they need to recognize if somebody isn't eating, drinking, is unconscious, is laying on the floor, is suffering from hypothermia, all these things take time. You don't need training to know that. I mean, I have the least medical training in this room, and I'd recognize that. Maybe they didn't have training to call 911. Maybe that's the training they didn't have. I don't know. But it's not the training not to recognize that this woman was in dire straits. Now, the medical training, and then maybe if they had had medical training, they could have given her some kind of assistance. But I don't see that that's anywhere in the record, that any kind of assistance they would have given her other than call 911 would have relieved her situation. No, they needed to call 911. Her health was a serious medical condition. I'm not arguing with you about that. Yeah, whether it's training to call 911, it's training to recognize that you can't just ignore a problem just because you don't see blood on the floor. You can't ignore a problem and let this patient, let this prisoner who can't take care of herself sit in a cell. It's got the lack of training has got to be the moving force of the injury. And I have to know what the lack of training is, what training, the lack thereof, that if it had been supplied would have prevented this absence of attention. The moving force of her injuries, I mean. Well, I mean, that's, the courts have said that's a, it's difficult to prove the moving, that's a high standard to prove that it's the moving force. What, we look at the facts, when you look at what happened in this case, and I know you don't like me going back to the facts, but the facts are that. It's your case, I'm sorry. No, no, no. You can make it any way you want. But the facts are that this, what makes this a problem in the training is, I go back to this. It wasn't just one guard. She didn't have a heart attack and a guard, you know, said, well, I'm not going to call. And the next guard comes in and calls and says, hey, we have an obvious problem. All these guards have obviously, we've got three guards. They're Faulkner, Anderson, and I wrote them down. Rahman, Rahman, Faulkner, Anderson, and Rahman. Three guards that we know of working three different shifts, and nobody recognized the problem. That is a problem in the training of those guards. I mean, I don't know how else it would explain all three of them ignoring this terrible situation. What do you have, I mean, the conditions in the jail, as your evidence shows, taking it as true, were terrible, no doubt. But she spends about three days in the jail. Then, by my understanding, she spends over a month after that in the hospital, and then she tragically passes away. How can you attribute her death to those three days in the jail versus the 30 days in the hospital? I know you've also sued the hospital, and the court here said those can go forward to the state court. Right. What evidence did you present showing that what happened during those three days in the jail is what caused her death? Well, you would obviously need expert proof. In this case, we had an expert physician, Dr. Sobel, and he offered an opinion, and he was deposed. He gave an opinion to a reasonable degree of medical certainty that had she been provided medical care in a timely manner when she was at the jail, she would have survived, more likely than not. He testified to that, his opinion is in the record. I still don't know. What was the cause of death? Multi-organ failure. Her kidneys shut down. Basically, she didn't eat or she didn't drink, and she remained in it. If you stay still long enough, your muscles start to break down. It's called rhabdomyolysis. I've been trying to pronounce that one this whole case, and I don't think I have it right yet. It's rhabdo is what they call it for short. She had all these conditions which shut down each organ, all of her organ systems, her kidneys, and eventually everything failed. Everything was shut down. Give four more minutes since we've taken your time so you can say everything that you need to say. But it seems that there is no kind of care they could have given her that would have ameliorated her condition. This is not in evidence. Nothing that they could have done would have helped her other than to get her to an emergency room somewhere. Now, if they had gotten her to a hospital earlier, there may have been a different outcome, but there's nothing they can do. I mean, even when she got to the hospital, there's nothing they can do. I mean, this woman is in the kind of sickness, as far as the record and the briefs, as I understand it, was beyond any help that you would expect any jailer to be trained to perform. I agree with that, and we're not arguing that they should be trained to perform the medical help she needs, but they should be trained, and they weren't trained to realize that you don't have to just bleed to be injured, that if you have a prisoner who can't take care of herself, who's not eating, who's not drinking, I mean, I don't know. What would they do about it? What was the training that they would have applied to her situation? If somebody hasn't eaten or drinking for several days and can't get off the floor, like we have evidence that she can't get off the floor, then call 911. She needs help. She needs to get out of there. Exactly. That's the point I'm making. I agree with you on that. I don't think that they should have rendered any medical care, but they did not have the training. They did not know, not just one of them, but all three of them did not know. Can I ask you about Dr. Sobel? My recollection is that you didn't put forth his evidence in your response to the summary judgment, so can we consider that? It's somewhere in the record, but you didn't cite it in response to the summary judgment. Well, it's a de novo review on the summary judgment. Right, but you're required to bring the evidence to the district court, not hide it somewhere in a pile of goo and then ask us to find it as a gotcha on the district court. So did you cite that evidence to the district court in the summary judgment process? I did not cite it in my summary judgment response. I did not cite it. I think I cited it generally, but not specifically. And the reason it was made part of the record is because I've had occasions where on appeal it will be raised, well, what about this other issue, and then you've got a place in the record where you can refer to it. It is part of the record. His opinion is part of it. That was never challenged in the summary judgment. There were a number of motions pending when this order for summary judgment came down. There were motions to strike Dr. Sobel. There were motions to strike their experts. This issue had to do with deliberate indifference and whether or not, you know, how obvious were the medical conditions that she was suffering from, and that was what we focused our argument on was what was raised in the motion. That would be my response to that, Judge, and thank you for the extra time. Okay, yes, indeed, and you've saved some time for rebuttal. Mr. O'Donnell, representing Marshall County. Good morning. David O'Donnell on behalf of Marshall County, and on the point regarding what training, what training should they have received to avoid what happened to Ms. Anderson that they found on Friday morning when they took her by ambulance to the hospital. The district court found in the summary judgment record that there was no articulation of what training was required. I mean, calling 911 kind of strikes me as, I mean, little kids know about calling 911. Yes, and counsel struggled before this court in articulating or not articulating what training was required as a matter of constitutional in Section 1983 law. I think the policies did say in an emergency call an ambulance or something. Yes, sir. But isn't the issue that they didn't know what was a medical emergency? I mean, in other words, sure, I think the policies say call the ambulance when someone's in need of medical help, but the issue is they weren't trained to know that this woman was in need of help. What training? Again, there's no evidence in the summary judgment record about what training that would have been, what should have been provided. How do you explain it? How do you explain the fact that they saw this woman in this distress and apparently took no steps to try to save her life or to try knowing that she was in this distress? Well, Your Honor, the proof is that when they saw her in the cell the morning they were taking her to the hospital, not to get too convoluted with the facts, but there was a chance record order to take her to the hospital that morning when they discovered her in the cell in the condition that plaintiff's counsel has described. And it was at that very instance that they called 911 as jail policy required. They called the ambulance. They called first responders. The first moment they saw her lying on the floor, nonresponsive, unable to get up on her own volition. Her mother came to visit her, and a doctor's appointment, as I understand it, was set up. The mother was supposed to come again, and then you had a snowstorm, and then the doctor had some reason to delay, apparently, cancel an appointment, but there were other delays that were involved in it. I mean, where did that come from? I mean, did that come from the jailers that they got the appointments, or who? Well, and that speaks to the county's medical policy in general and also specific to this population that we're talking about, the mental detainees. Ms. Anderson was at the jail pursuant to state law on an involuntary commitment proceeding. She was being evaluated to determine whether or not she was in need of further mental treatment, and the evaluation she was supposed to receive within 48 hours of her incarceration included a full-blown medical review as well as a psychological review. So she was there for the very purpose to receive a medical evaluation. Now, they set jail staff, according to their policy procedure, they set up the appointments with the physicians, but an act of God. The snowstorm happens on the day they had set the appointment. The doctor's office canceled. So is it your position that if the snowstorm had not occurred, she would have gone to a doctor's office on that day? Yes, sir. Which would have been, what, the second or third day she was in the jail? That would be the, well, it was going to be within 48 hours of her incarceration. So it was going to be, the examination was going to be on Thursday, February the 10th, in the afternoon. And when did she finally leave the jail? February the 11th, the following day at around noon is when they discovered her in the cell. Emergency was called. They took her to the hospital. So, again, as soon as they saw her in that condition, they acted. What kind of action? And surely the mother would have been concerned about it. So what, did the mother ask the jail to get her to a hospital and they refused to do so, or what? No refusal. They did exactly as, it was one of those situations where the mother was in the cell with the jail staff. They're all seeing Ms. Anderson in the condition she was in. The mother says, we need to get her to the hospital. Of course, that's why she's there to start with, is to take her to the hospital, pursuant to the Chancellor's Court order. But it all happens at the same time. So the mother says, we need to take her to the hospital. Jail staff calls. They call the ambulance. Ambulance arrives. They take her to the hospital. But before then, did her mother come to visit her at the jail? Yes, sir. The mother arrived on the 9th of February, the first full day that Princess was there at the jail. February what? 9th? February the 9th, yes, sir. And then you're supposed to be there the following day, the 10th. But again, the snowstorm prevented the mother from arriving at the jail, the same storm. The mother was there on the 9th. They had a doctor's appointment set up for the 10th. Is that what you're saying? Yes, sir. And the snowstorm came, and neither the mother nor the doctor got to the jail that day. And in the meantime, her situation began to get worse and worse. That's correct. And then that's on the 10th. And then on the 11th, the day after the snowstorm, is that the day that they call 911 and send her to the hospital? Yes, sir, Judge Shelley. That's exactly how the chronology works. So, you know, in the morning around noon-ish is when the call comes to get her ready to go to the hospital because of the need for another ultrasound. What about that mental health evaluator, Shelton? Didn't she come and look at her, I think within the first day or so, and recommend that she be transferred to a hospital? On February the 9th, she arrives, does a psych evaluation. It's not lengthy, but she arrives at the cell. She interviews Ms. Anderson. She reports that she's standing. She's not verbally responsive, but they do the evaluation very significantly. The evaluation says she should be sent to a hospital? For psychiatric reasons, for psychosis. It's hospitalization for psychosis. And that didn't happen? You had other inmates saying she needs to get help. I think some of the inmates were actually trying to call for help themselves, and yet the guards aren't able to realize she needs help? Well, Ms. Shelton's report goes to the physicians who are going to examine her the following day. That's how the state procedure works. So her report goes to the physician that it was intended to, but she's not there to direct that she go to the hospital immediately. That's jumping the gun a bit because she's not there as a medical professional to do an evaluation and determine whether or not she truly is in need of further mental assistance or whether there might be underlying medical causes. But it sounds like everyone else who's been in that jail, including the other inmates, this mental health evaluator realizes this woman needs to be sent to a hospital. Everyone pretty much believes that except for the jailers. Right, but there's ambiguity in the record about that because what they're talking about, what Ms. Shelton's talking about, for example, is that she doesn't need to be in the jail. She needs to be in a hospital for mental treatment. It's not that there's an emergent medical condition. Not for medical. Right. So then her condition, her medical and physical condition, worsened on the 10th. Is that when she was seen on the 9th by the technician here? And at that time she was standing and no physical problem reported at that time. Is that correct? That's correct, Judge Yawley. And then on the 10th is when her condition worsened, but that is on the day that she was to have a medical appointment. That's correct. And the snowstorm came. And then during the 10th is when her physical condition deteriorated to the extent that it was found at the time you call 911? Well, the record's not clear on that. We know what condition she was found in the morning of the 11th, how precipitous her condition declined on the 10th. Is that on the 10th? Is that when inmates began to say somebody needs to call or get this woman to a hospital? There's testimony that inmates tried to alert the jail staff and did alert the jail staff. The contemporaneous jail records show that she was checked on through the day. But, yeah, I mean, ultimately we know the condition she was found in on the 11th. And then on the 10th is the day of the snowstorm. So how much of this can we blame on the snowstorm? I mean, an ambulance could have come through in the snowstorm and picked her up and taken her to a hospital, I suppose. Well, that's speculation. We don't know. I would assume an ambulance could have arrived. But, again— In other words, there's no reason for their not calling an ambulance on that day at the urging of the other inmates other than they said, well, we checked on her and she didn't look that bad. What did they say? Well, if ultimately we're concerned about what the policy was and whether there was a need for additional training, there's nothing from a policymaker's standpoint that that situation would say there was a need for further training if you're relying on a single incident exception. The law generally requires that there be a series of prior similar incidents to show a need for additional training. I understand that, but that's not responsive to the question I asked. Well, if the court is asking whether or not there was an underlying constitutional violation, a deliberate indifference— No, I'm not asking that. I mean, that's the next step. I'm just asking what actually occurred. Well, what actually occurred is that there were inmates who testified that they tried to call 911. On what day? Pardon me? The inmates tried to call 911. There were two. What did 911—no response from them? There was no response because they were making collect calls and 911 doesn't accept collect calls, and that's not the jail in any event that they're calling. They're calling the 911 operator. So we don't think there's any attribution to the county or any reflection on the jail policies. So if we're trying to figure out what happened on the— It does seem like—I mean, it does seem, I mean, that the jailers, I mean, at least on what we've been told here, not to make any final judgment about it, but that they were grossly negligent. But the standard is subjective. The constitutional violation standard is subjective deliberate indifference. I understand the monorail liability and the constitutionality. I'm putting that aside for the time being, except for the fact that you would think that an ordinary person would need any training to recognize someone is in a dire situation, and that is supported by that inmates recognize it to the extent that they are calling 911. Well, we have inmates who see an individual who's acting behaviorally, bizarrely, down on the floor, up on the floor, not speaking. They regard her as someone who doesn't belong in the jail. I think the jailers agreed with that. We don't need mental detainees in a jail setting. The law requires that she be placed there. The chancellery court order required that she be placed there. So I think everybody is in agreement that the sooner the better for Ms. Anderson to leave the jail. That was a good result. But a snowstorm occurred on the 10th, and she did not get a medical evaluation. I mean, it was a fairly quick period of time. I mean, 9th, 10th, and 11th. But her condition deteriorated on the basis of what we've been told significantly, apparently on the 10th. And I think her condition continued to deteriorate. It's not part of the summary judgment record. It wasn't necessarily that, but the medical evidence regarding her continuing deterioration while she was at the Union County Hospital. What about the experts? That testimony was not admitted in summary judgment. Dr. Sobel, the two or three pages that were part of the summary judgment record that the plaintiff submitted, it's a series of questions that I asked Dr. Sobel to describe. What problems do you have with our medical care policy? He could not tell me anything other than he thought there was not enough in our suicide prevention policy. And then he switched to talk about what the jailers did. Sobel was not the one that did the autopsy or could testify as to the cause of death. Oh, well, yeah, the autopsy was part of the record. Dr. Sobel. What was the cause of death? I mean, multiple causes of death. Yeah, it was non-traumatic according to the autopsy. It was not induced by a traumatic injury. It was a multisystem organ failure, which I think translation is we don't know what caused it. It wasn't suicide. It was not suicide. It was just one of those there's no finding as to causation essentially. She did not come to the care of Mount Marshall County Jail as a healthy individual to begin with. But she was medically cleared for the jail setting by the physicians at DeSoto County. Unfortunate that she was there, but she was. And I think in this case, the only theory that the plaintiff advanced in any manner whatsoever before the district court and summary judgment record was that there was a failure to train. Have they done any additional training since this happened? Have you had the incident that puts you on notice of how these things go? Has there been further training? I frankly don't know that, Your Honor. I've not inquired about the other training. Just one of those things. I think there was a post-incident evaluation done. There were statements taken by the jailers to determine what happened, who knew what. But, you know, none of the individual jailers were sued in this case. If there was a remedy, more likely there than anywhere. Not to say that what they did was subjective deliberate indifference because I think her. Pretty shocking. Your Honor, the condition they found her in on Friday morning was shocking. But the way they treated her on the 10th was pretty shocking. Well, I don't agree. They didn't call 911. I think they were dealing with an inmate they felt was acting consistent with their psychological issues that brought her to the jail and no appreciation for any medical issues. Okay. Thank you. Thank you, Mr. O'Donnell. Mr. Davis, representing the Baptist Memorial. Thank you, Your Honor. May it please the Court, the issues related to my client, Baptist Hospital, I don't think have been raised in the context of the arguments to date. They primarily revolve around the Court's declining of supplemental jurisdiction following the dismissal of the federal court claims. Since they have not been brought up, unless Your Honors have specific questions about that. That's good because he can't talk about it either since he didn't bring it up either. Then I will defer any questions about that unless Your Honors have specific questions. With that, I would only like to add a little bit to Maybe you're adding enough that he can talk about it now. Whatever you want to do. Specifically with regard to the single incident exception, Your Honor, I believe the case law and the vow decision highlights the fact that when a point that Your Honor was making earlier that there's been no specific allegations or specific proof about individual jailers. Why do you have a stake in that? Your Honor? Why do you have a stake in whether the jail was deliberately indifferent?  That's correct, Your Honor. And why do you have a stake in what happened before she came to you? This actually happened subsequent to us, Your Honor. My client discharged Ms. Anderson into the care of the Marshall County Jail. So you're saying that's what you're arguing about, not the care that you gave her the 30 days? The decision that was, the treatment that was challenged subsequent to her release from the jail was treatment provided at a separate hospital within the same system, which is a separate entity. It is not a party to this case, although there were questions raised about the adequacy of that care and whether or not that subsequent care at a separate facility was the true cause of her death. You're arguing with the original hospital? That's correct, Your Honor. I get it. She originally came to us through the emergency room, was, after about 13 or 14 hours, medically cleared to go for the 48-hour period to await further physical and psychological evaluation pursuant to the involuntary commitment process. Okay, but I still don't get how you have a stake in what the jailers did. Well, Your Honor, the question before the court is, if the court then reverses the decision of the dismissal of the federal law claims, then that may have a potential impact upon the supplemental jurisdiction question. You're a defendant in the case, right? That's correct, Your Honor. And they've alleged that you should not have discharged the patient to the care of the jail. Is that correct? That's correct, Your Honor. Purely state law claims. Okay, purely state law claims, and she did not remand the state law claims. Did she address the state law claims? She dismissed them without prejudice, Your Honor, by declining supplemental jurisdiction. So you're dismissed? That's correct, Your Honor. And I'm simply adding to the arguments about the . . . So you're saying that it was the district court in error in dismissing you? No, Your Honor. I'm saying the district court was correct in dismissing the federal law claims and then therefore dismissing the supplemental jurisdiction claims. Okay. Whoa, whoa. I thought you were saying . . . So, tell us again what your position is. If we affirm as to the dismissal of the county, then what do you want us to do as to you? As well as affirm the dismissal of the supplemental jurisdiction, which leaves those claims to be resolved in state court. You want to be in state court? Yes. Bottom line. That's correct, Your Honor. That's correct, Your Honor. We believe that these purely state law claims should be resolved in a state court forum,  Are you a plaintiff or are you a defendant? Okay. Because your issue was, did District Judge Deborah Brown have user discretion in declining to exercise supplemental jurisdiction over the state law claims? Are you not Mr. Davis? Yes, ma'am. I'm sorry. Are you a plaintiff or a defendant? I'm a defendant, Your Honor. Okay. And you made the argument . . . That she correctly dismissed our claims. Correctly dismissed the claims. Okay. I get it. I get it. Okay. The only point I was trying to make, Your Honor, was that the vow decision about looking at the single incident exception commonly involves the proclivities of the particular officer involved. There was no evidence about the proclivities of any particular officer, much less any particular officer identified as having done something wrong in the care of Ms. Anderson. And we fully agree that there's strong evidence of gross negligence on the part of the jailers, which would be appropriately considered in the state court action without the county even being a party. But that does not rise to the level of a constitutional violation, which the plaintiff has argued in this case. Finally, Your Honor, just again to the causation question, Your Honor already noted that the causation must be a direct cause. The case law says a but-for cause or traditional negligence cause is insufficient without any evidence of what the training was or how it was deficient.  Thank you, Your Honor. Thank you, Mr. Davis. All right, Mr. Szymanski, I probably got it wrong again, right? No, that was actually right. You said my name correctly. I made so many notes and I'm terrible. I'm so unorganized. But let me just, a couple things that come to mind. There is a difference in the policy. Now, when we took the jail administrator's deposition, they actually have a nurse now. Their policy actually provides for a responsible physician, which they had at one time. But at the time our client was there, they didn't have either. So, yeah, there is a change. And I think that also plays into the single incident exception because you can't compare times when they had medical staff there. It's not fair to compare when they had a responsible physician or later when they had a nurse. There is no pattern of this conduct.  Because they had a responsible physician at one time and now they've got a nurse. So you wouldn't expect them to have the problem that they had with our client because circumstances change. I didn't even discuss two cases which I think are, one case is a Supreme Court case directly on point, and I wanted to mention this, Canton v. Ohio. In Canton v. Ohio, I mean, we have almost an identical case except they have a lot less facts on their side. The injured person there was only there at the police station for one hour, for one hour, and they didn't call an ambulance. And she was then taken by her family to a hospital where she then stayed for a week. So they looked at that, and that was a single incident exception. And they looked at that and said that that was when they said, well, actually I'm quoting from Brown v. Bryan County, but they are quoting Canton to say, with the need for training so obvious that the failure to train is delivered in difference. I said that wrong. I read that too fast. This need for training is so obvious that the failure to train is delivered in difference to constitutional rights. The example they were talking about there, which I've read in many of these cases, is we know that police officers are going to have to chase down criminals, so you've got to teach them how to handle firearms. And I'm paraphrasing. I'm sure you all have read that before. Okay. And, you know, I apologize if I didn't get it right then, Judge. But the point being this. We know by statute that just like we know to a moral certainty that police are going to have to arrest criminals, we know by statute that they're going to have to take care of mental detainees because the statute says they have to do it. And if the statute says they have to do it, it's just like saying police officers have to chase down criminals. We know it's going to happen. But there's a policy that they're supposed to check on her every 15 to 30 minutes. They didn't do that, obviously. So what difference would the policy have made? Telling them you're supposed to do it. They said we were told we're supposed to do that. They didn't do it. Yeah. So what's the problem with the training? The problem seems to be with the jailers rather than the training and the policy. Well, I would argue that it's the training, not the policy. Obviously they didn't follow the policy, but it's the training which amounts to a policy argument. Would you testify that they were told to check on these kinds of patients? Again, I'm not being disrespectful. I think it's a terrible thing what happened to her. But they were told to do that, and they didn't do it. Right. But the reason they saw her condition, they just didn't recognize that she needed 911, and they should have recognized she needed 911, and they should have made the call. That's your argument right there. That's my argument, yes. That's your argument. I should probably then just end it with that. They should call 911, and that was the moving force that caused the injury, and it resulted from a policy of the county of not training people to call 911 when they saw somebody in a desperate situation. Yes, Your Honor. That is my argument, and more so my argument is that that is really a question for the fact finder to weigh and not for the judge in a summary judgment motion. You've heard the arguments. There's arguments to both sides in the inferences and implications from the facts in this case and what they mean, and our whole point is let's let a jury decide this. This is somebody who's, I mean, we look at 1983, and I know I don't do these cases, and I may never do another one again after seeing this because it seems to me such an obvious deprivation of her rights. You don't know 1983. It does seem strange. It's an obvious deprivation. In particular, let Mon-El. Why didn't you sue the jailers for the obvious deprivation of her rights? Because I couldn't prove it. It would be impossible to prove causation for which jailer caused the injury. It would be impossible to prove it. Everybody could say, well, you know, somebody saw her after me. Well, somebody would be the last guy. But, I mean, you did what you did, and Mon-El liability is hard to make. It just is. It's intentionally so, and that's what people are saying. They have a problem with Mon-El. But Mon-El is essentially, is very intentionally hard to meet because the county has got to pay for the negligence of its officers out of the county funds, and they make darn sure that they're not going to pay for just ordinary negligence or even gross negligence. It's got to be the county itself caused the injury before you're going to get into the county's pockets. And the county can do that by virtue of a policy or a failure to adopt the appropriate policy. But if it's not the county act, I mean, I don't care how bad the injury is. You're not going to get county liability. But it also says that Kenton says they can also do that by failing to train. It's almost an identical case. I don't know. A single incident is hard enough. Failing to train as a policy. They've got to have a policy. The fact that they failed to train these individuals here does not get you across the line in and of itself. It's good evidence. But it does not itself establish a policy on the part of the county. Okay. Well, I've quoted you my cases where I thought it. That's the way I . . . Stay away from 1983. But it's not a particularly good hand. But it's a very, very sad case. If that's not a good hand, then that's improper, in my opinion, for somebody to suffer that kind of deprivation of those rights and plus to say no. Get Monell reversed. Thank you, Your Honor. Thank you, sir. Okay. We'll call the next case.